UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| **DEANGELO L. THOMAS,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:07-CV-114-SNLJ |
| ) | |
| **ALFORD NORTHERN,** *et al.*, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Plaintiff has filed this §1983 action alleging a violation of his Eighth Amendment right against "excessive force" due to the use of pepper spray during his detention at the Missouri Department of Corrections' Southeast Correctional Center. This matter is before the Court on defendants Alford Northern, Gary Rusher, Ray Hopper, Stephan Clark, Danny Kirkman, Jonathan Rice, Robert Hooper, and the Missouri Department of Corrections's motion for summary judgment (#95), filed on August 12, 2009. Responsive pleadings have been filed and the matter is now ripe for disposition.

**I. Case Summary**

Plaintiff was an inmate in the custody of the Missouri Department of Corrections (MDOC) and confined at the Southeast Correctional Center (SECC) in Charleston, Missouri. He is now incarcerated at the Jefferson City Correctional Center. The seven individual Defendants were each employed as corrections officers by the MDOC at SECC during the relevant time period.

Plaintiff was incarcerated at SECC in the Disciplinary Segregation Unit (DSU) in Housing Unit 1, B-Wing, on February 17, 2006. Plaintiff had a history of offenses while at the

SECC. Up to that date, plaintiff had been in Administrative Segregation and Disciplinary Segregation numerous times for various offenses, including possession of a prison-made knife, fighting with another inmate, assaulting another inmate with a knife, and for stabbing another inmate with a knife. Plaintiff was also serving prison sentences for felony convictions of first degree robbery and armed criminal action, and an assault at SECC on February 12, 2005, during which he was convicted of "Violence to an Employee of Department of Corrections or Inmate by Inmate."

On February 17, 2006, around 5:00 p.m., plaintiff declared a medical emergency and went through the procedure of the DSU, which entailed "cuffing up" before being removed his cell. "Cuffing up" involves the inmate placing his hands behind his back and through the opened food port on the cell door so that handcuffs can safely be placed on the wrists. After the nurse examined plaintiff, he was returned to his cell and the "cuffing up" procedure was performed in reverse. Plaintiff at this point kept one of his arms through the open food port and refused to remove it. Officers were unable to close the food port door with plaintiff's arm stuck through the opening, and perceived this as a threat to the safety and security of the DSU. Food ports are generally only opened when an inmate is asked to "cuff up", when handcuffs are removed, or for the delivery of food, medicine, books, or other items. Open food ports are considered an immediate security risk because an inmate holding it open may have a dangerous weapon such as a "homemade spear with a prison made weapon attached to the end," or "a container full of feces, urine, or saliva" to throw at them.

Plaintiff was repeatedly given orders to remove his arm, and yet he refused to do so. During this episode, the disturbance reached a noisy crescendo, with other inmates yelling and kicking their cell doors. After the continued non-compliance of plaintiff, defendant Northern

contacted his supervisors to notify them of the situation in the DSU. Defendant Hooper, the shift commander at SECC that night, confirmed with prison medical staff that plaintiff did not suffer from any medical condition that would prevent the use of pepper spray while neutralizing the situation. Defendant Hooper was informed by medical staff that it would not be medically inappropriate to do so, and he subsequently authorized its use.

After authorization, Northern and defendant Rusher arrived at plaintiff's cell around 8:40 p.m., almost four hours after the beginning of the incident. Rusher brought a video camera and videotaped the events, while Northern administered the pepper spray. The video reveals that Northern stated to plaintiff, "I need you to remove your arm from the chuck hole, so I can secure it, or I will use pepper spray." Defendants' Exhibit L. Plaintiff continued to grab the food port door, refusing to follow the order. When Northern administered the pepper spray, plaintiff grabbed the wand of the pepper spray canister and bent it, then grabbed at Northern's hand. Northern administered three more short bursts during the struggle, and eventually plaintiff removed his arm from the food port. No further pepper spray was administered, and no physical force was used by any defendants.

Subsequent to the incident, plaintiff was assessed by a nurse. Nurse observed no cuts or bruises as a result of the use of pepper spray, only "red, watery eyes." Although plaintiff had access to clean, running water from his sink in his cell, he proceeded to dunk his head in his toilet. Defendant Kirkman provided plaintiff some towels to help him clean himself in his cell, and at approximately 4:00 a.m. on February 18, 2006, plaintiff's cell was cleaned by inmate porters.

Plaintiff did not declare a medical emergency following the use of pepper spray on February 17 or 18, 2006, and although plaintiff alleges health conditions due to the pepper spray, no physician has ever diagnosed the February 17, 2006, incident as the cause of his skin

3

condition or headaches. Plaintiff testified in his deposition that he experienced continued problems his vision, skin, and experienced headaches as a result of the pepper spray, however, he also testified that after "about 20 or 30 minutes," the effects subsided and he gained relief from the pepper spray. Plaintiff has been prescribed glasses for his vision, hydrocortisone for his skin, and takes ibuprofen for his headaches.

**II. Summary Judgment Standard**

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed.R.Civ.P. 59(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to the discussion.

## III.  Discussion

Defendants have raised a number of defenses to plaintiff's claim, which include that the individual defendants are entitled to qualified immunity, that defendants Rusher, Rice, Clark, Hopper, and Kirkman were not directly involved as required under §1983, that the doctrine of respondeat superior is inapplicable to a §1983 claim against defendant Hooper in his supervisory capacity, and that plaintiff is not entitled to declaratory or injunctive relief. Each of these defenses will be unnecessary if it is established in the first place that there is no 8th Amendment violation, however, because plaintiff's claims would necessarily fail. For this reason, the Court will immediately address whether there was a violation of plaintiff's 8th Amendment right against cruel and unusual punishment.

### A.  Eighth Amendment Standard

The Eighth Amendment's prohibition against cruel and unusual punishment has been interpreted by the Supreme Court to include a right to safe and humane conditions of confinement. *See Farmer v. Brennan*, 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To prove an Eighth Amendment violation, a prisoner must satisfy both an objective and subjective requirement. To satisfy the objective requirement, it must be shown that the deprivation of rights was sufficiently serious when viewed objectively. *Id*. at 834, 114 S.Ct.

1970.  To satisfy the subjective requirement, the inmate is required to prove that the prison officials had a "sufficiently culpable state of mind." *Id*.  A violation of the Eighth Amendment depends on the specific claim.  In excessive force claims, the subjective inquiry is whether the force was used "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Arnold v. Groose*, 109 F.3d 1292, 1298 (8th Cir. 1997) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)).

When determining whether there was an excessive use of force, the Court should consider "whether there was an objective need for force, the relationship between any such need and the amount of force used, the threat reasonably perceived by the correctional officers, any efforts by the officers to temper the severity of their forceful response, and the extent of the inmate's injury." *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002).

Notably, the Eighth Circuit has previously held that the use of pepper spray after an inmate has disobeyed a direct order from an officer was not malicious or sadistic, but was a good-faith effort to maintain order or restore discipline.  *See, e.g. Jones v. Shields*, 207 F.3d 491 (8th Cir. 2000).  In that case, where the effects of the pepper spray cleared within 45 minutes, a court determined that a limited application of pepper spray to control a recalcitrant prisoner was a tempered response as compared to other forms of force available.  *Id*. at 496.

### B.  Eighth Amendment Analysis

#### i.  Objective Requirement

A careful consideration of the facts reveals that there was an objective need for force in this case.  It is extremely important for prison officials to maintain order and discipline within their facilities, and a defiant inmate that disregards orders to close a food port can be a safety

6

risk and can instigate further disturbance throughout the housing unit. One way or another, it was necessary for the officers to shut the food door, yet plaintiff repeatedly refused to remove his arm. Balancing this need to shut the door with the amount of force applied, it was a reasonable decision to use the pepper spray. As defendant Kirkman explained in his deposition, reaching through the chuckhole and attempting to put plaintiff in a wrist lock was fraught with danger, as plaintiff could have grabbed Kirkman's wrist, fallen to the floor and potentially broken his elbow. Considering the options, the threat and use of pepper spray balanced this need to shut the door with the perceived threat from the plaintiff, all in a manner that cannot be described as malicious or sadistic. Furthermore, attempts were made to temper the severity of the officers' actions. Plaintiff was made aware of the potential consequences of his actions and still refused to obey direct orders. There was a period of almost four hours where no direct action was taken while authorization was granted from supervisors and medical staff. The video shows clearly that before the pepper spray was used, the officer first warned plaintiff that he was about to use the pepper spray if plaintiff did not remove his arm, and only when plaintiff again refused to comply did the officer proceed. In addition, only short, minimal bursts were applied. Finally, the extent of plaintiff's injury does not reach the level of "excessive." Although plaintiff has experienced vision, skin, and headache issues that may or may not have been caused by the incidents of February 17, 2006, he has been prescribed treatment for each of these conditions. Under these circumstances, viewed objectively, there was not a sufficiently serious deprivation of plaintiff's Eighth Amendment rights.

### ii. Subjective Requirement

Even if there had been a sufficiently serious deprivation of rights, plaintiff fails to meet the subjective requirement to prove that the prison officials had a "sufficiently culpable state of

7

mind." Viewing the facts in the light most favorable to the plaintiff, there was instead a "good faith effort to maintain or restore discipline." *Arnold*, 109 F.3d at 1298. When analyzing the subjective requirement and state of mind of the prison officials, it is important to bear in mind that plaintiff presented a legitimate threat based on his prior history of violence and known concealment of prison-made weapons. From the beginning of the incident to the end, procedures were followed to minimize any potential for a constitutional violation, and the course of action taken was deliberate, cautious, and carefully chosen with all potential dangers considered. The facts show that plaintiff repeatedly refused direct orders to remove his arm from the food port, and the video shows that he again refused to move his arm when faced with the immediate threat of pepper spray. In response, the prison officials followed established procedures to neutralize the situation. These procedures were created and followed to maintain reasonable conduct during high-pressure prison incidents that can all too easily escalate, and occasionally end with unfortunate results.

In addition, even if it were shown that plaintiff had an abnormal reaction to the effects of pepper spray, he has failed to show that any of the staff knew about the possibility of a reaction and that they deliberately disregarded that danger. All in all, there is no evidence whatsoever that would point to the kind of malicious or sadistic conduct that is necessary to establish the subjective requirement for an Eighth Amendment violation.

### iii. Eighth Circuit Case Law

Plaintiff cites to *Hickey v. Reeder*, 12 F.3d 754 (8th Cir. 1993), for the proposition that it is an Eighth Amendment violation for prison officers to use pepper spray against a noncompliant, but nonviolent, prisoner. *Hickey*, however, is distinguishable because that case involved a stun gun, a weapon that "inflicts a painful and frightening blow, which temporarily

8

paralyzes the large muscles of the body, rendering the victim helpless," and use of such a weapon, according to the Eighth Circuit, passes the objective component of the Eight Amendment. *Id*. at 757. The Eighth Circuit concluded that the stun gun "was used on Hickey to cause enough pain and harm to force him to sweep his cell, and to make an example out of him." *Id*. at 758. This Court is much more hesitant to reach the same conclusion for pepper spray, however, in the context of the facts here and in view of the more recent Eighth Circuit case of *Jones v. Shields*.

Plaintiff also cites to *Walker v. Bowersox*, 526 F.3d 1186 (8th Cir. 2008), which does involve the use of pepper spray. However, this Court is unconvinced that *Walker* controls, because in that case, and unlike the case at hand, the officer "gave no warning before first spraying around the port—with a super soaker used for riot situations—and Walker was moving away from the port when Knarr sprayed him a second time directly in the face and soaked the entire cell and bedding with spray." *Id*. at 1189. The case at hand is much more akin to *Jones v. Shield* because both involve a limited application of pepper spray in a tempered response to control a recalcitrant prisoner.

**IV. Conclusion**

For the foregoing reasons, summary judgment will be granted as to defendants Alford Northern, Gary Rusher, Ray Hopper, Stephan Clark, Danny Kirkman, Jonathan Rice, and Robert Hooper, and the Missouri Department of Corrections.

Dated this  29th   day of October, 2009.

_____
UNITED STATES DISTRICT JUDGE